UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LOUIS CHARLES HAMILTON, II | CIVIL ACTION |
| VERSUS | NO.  09-7029 |
| WALTER A. DENNIS, ET AL. | UNITED STATES MAGISTRATE JUDGE KAREN WELLS ROBY |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was before the Court for a non-jury trial upon the consent of the parties pursuant to 28 U.S.C. § 636(c).[1]  The bench trial took place from April 11 through April 12, 2011.[2]

I.      Background

The Plaintiff, Louis Charles Hamilton, II ("Hamilton"), a resident of Texas, filed the instant diversity action against the Defendants, Walter A. Dennis and Rosemary Dennis (collectively, "the Dennises"), a couple who are in their 60's, on April 3, 2009.[3]  (R. Doc. 1.)  The Dennises are homeowners in the State of Louisiana.

---

[1]Rec. Doc. No. 54.  The Court notes that the Defendants did not file an Answer in this matter.  However, the history of this case shows that the Defendants have made an appearance in this case and have shown their intent to defend against all of the plaintiff's claims.  For examples, the parties participated in the Scheduling Conference and Pre-Trial Conference in this matter.  Finally, the Defendants participated in the trial in this matter.  *See JMC Construction LP v. Modular Space Corp.*, 2008 WL 4531819 (N.D. Tex. 2008).  The Plaintiff did not object to the Defendants' failure to file an Answer, thereby waiving his rights to allege that the Defendants waived their defenses.  Fed.R.Civ.Proc. Rule 12.

[2]Rec. Doc. No. 70.

[3]The matter was initially filed in the Eastern District of Texas.  On October 1, 2009, it was transferred to the Eastern District of Louisiana.  (*See* R. Docs. 21-23.)

Hamilton, a contractor who travels to various states affected by natural disasters, claims that he contracted with the Dennises to repair their home, located at 3826 General Taylor in New Orleans, Louisiana, after it sustained damages from Hurricane Katrina in 2005.  In his Complaint, Hamilton claims that the Dennises breached the contract by failing to purchase French windows and doors and failing to pay for his services.  He also alleges that the Dennises breached the contract by failing to pay him for the materials he purchased.  Hamilton further claims that the Dennises were vulgar, used racial slurs, and harassed him so that he would be forced to leave the job without completing the necessary repairs.  Hamilton claims that the Dennises purposely did not want him to finish the repairs because they had squandered their insurance money on a sports utility vehicle.  Hamilton further claims that he made repairs in addition to those required under the contract and was not compensated for this work.  He also claims that the Dennises owe him money for the materials he purchased for the home.

Hamilton's Complaint further alleges that the Dennises defamed him throughout the community causing him to lose business.  Hamilton complains that the Dennis' actions have caused him emotional distress.  He seeks $21,000.00 for breach of contract, damages for fraud[4], loss of earnings in excess of $58,000.00 from defamation, $2,400.00 for extra work performed under the contract, a public apology to one of his crew members, Fai K. Yee, a declaratory judgment finding the Dennises breached the contract and committed fraud, and $49,500.00 for his mental anguish and emotional distress.[5]

---

[4]Hamilton did not include a monetary sum for his alleged damages resulting from the Dennises alleged fraud in his Complaint.

[5]In addition to the above captioned lawsuit, Hamilton has filed several various actions against the Dennises in both Texas and Louisiana arising out of the exact same circumstances of this matter.

II.     **Findings of Fact**

Hamilton is an unlicensed contractor who holds himself out as Multi-Construction, a business that is not authorized to do business in the State of Louisiana, does not file income tax returns, and otherwise does not have any paperwork filed with any authority which acknowledges it as an entity. Hamilton contends that he has approximately 33 years of experience in construction.  Hamilton testified that he makes his living by traveling to various states chasing natural disasters and repairing destroyed homes.

During the trial on this matter, Hamilton testified that (1) he had no license to perform contract work or mold remediation in the State of Louisiana; (2) neither he nor Multi-Construction have ever filed federal or state income tax returns; (3) he does not have workers' compensation insurance; (4) he hired illegal immigrants as part of his crew; and (5) he operated on a cash only basis because he did not have a bank account due to his bad credit.  It is under this backdrop that the story of his relationship with the Dennises begins.

Hamilton first met the Dennises in early February, 2007, through the Dennis' daughter, Angela Dennis ("Angela").  Hamilton had previously provided an $18,000.00 estimate to Angela for repairs to her home which sustained damages from Katrina.[6]

The Dennises owned a 2,200 square foot home that consisted of a basement, a first floor with living room, a second floor with bedrooms, and a third floor with an attic room.  As a result of Hurricane Katrina in 2005, the Dennis' home sustained severe damages from wind and flood which necessitated repairs before the home could be occupied.

---

[6] The Court notes that this testimony differs from the Complaint, which indicates that Hamilton had a contract with Angela for $8,500.00.  Rec. Doc. 1, p. 10.

3

In early February of 2007, Hamilton and the Dennises orally agreed that Hamilton would perform repairs on their home. Prior to commencing his work, however, the Dennises had partially gutted their home. The parties disagree as to the extent of the gutting performed by the Dennises, but do agree that everything below the four (4) foot flood line was in fact gutted by the Dennises.[7] By oral agreement, Hamilton contracted to gut the remainder of the home for $700.00 and was in fact paid for this work. The Dennises orally contracted for Hamilton to repair the remainder of the home.

On February 14, 2007[8], Hamilton commenced the remainder of the gutting work. Hamilton also cleared the debris in the home and took out all of the nails. He also pulled the tile flooring from the basement of the home. Subsequently, he used a bleach concoction[9] to treat the visible mold on the first floor of the home even though he did not have a license to do so. Hamilton acknowledges that mold is not always visible and grows upward. Nonetheless, he only treated the visible mold on the first floor. Hamilton acknowledges that he did not test the home to determine whether mold existed elsewhere.

On February 24, 2007, Walter Dennis entered into a written contract with Multi Construction for the reconstruction of the Defendants' home. Hamilton testified that the written contract reflects various amendments made to the oral contract. He further testified that the present lawsuit relates to the Dennis' alleged breach of the written contract.

---

[7] Hamilton contends that this was the only gutting work performed by the Dennises. The Dennises, on the other hand, contend that they gutted approximately sixty percent (60%) of the home.

[8] Hamilton testified that all dates were an approximation.

[9] Under Louisiana law, "[p]ersons who provide mold remediation must hold a mold remediation license with the State Licensing Board for contractors. Mold remediation contractors must submit certificates evidencing workers' compensation coverage in compliance with Title 23 of the Louisiana Revised Statutes of 1950 and liability insurance in a minimum amount of fifty thousand dollars ($50,000.00)." a. R.S. 37:2150-2192. Hamilton testified that he did not have a mold remediation license and further testified that he did not provide any workers' compensation to his crew members. He further testified that the bleach concoction he used to remove the mold was made of one part water and one part bleach.

4

Under the Contract, the Dennises were to pay $49,500.00 for the reconstruction of their home, plus the cost of materials. Hamilton testified that his maximum contract rate in Louisiana is $49,500.00 plus the cost of materials because of his belief that New Orleans' law requires a permit for home construction in excess of $50,000.00. He acknowledged that he purposely contracts for $49,500.00 to circumvent this requirement.

The contract required the Dennises to provide an initial payment of $24,500.00 for materials and labor. After certain tasks were completed, including the completion of the electrical installation, the Dennises were required to provide a second "draw" or payment of $13,500.00. Upon completion of the entire home, the Dennises were to provide a final payment of $11,500.00.

From February 22, 2007, through March 2, 2007, Hamilton repaired a bathroom on the second floor which had fallen in. Hamilton testified that the work on the bathroom was not a task included in his contract with the Dennises. Hamilton tore out the bathroom, re-framed it, and repaired the sewer line. Hamilton further testified that he "ate" the repair costs associated with the bathroom. Hamilton further testified that he never sought compensation from the Dennises for this work, nor does he currently seek compensation for this work.

On March 5, 2007, the Dennises provided Hamilton $12,102.35 to reimburse him for materials he purportedly purchased even though he failed to present receipts for the materials as a substantiation of the expenses. Hamilton testified that the Dennises overpaid him for the materials. Therefore, he provided the Dennises with an undated "Material Cost Sheet" which demonstrated that the Dennises overpaid, and therefore had a credit of $5,578.67 for material costs.

On that same day, Hamilton built a cement block for an air conditioning unit. The purpose of the cement block was to ensure that the unit was raised in case another flood of the home were to occur.

In early March, Hamilton noticed that a portion of the roof required repair because it was leaking.  Hamilton testified that because roof repairs were not included in the written contract, Hamilton and the Dennises separately and orally entered into the contract in which Hamilton would repair the leak on the roof for $700.00.  Hamilton testified that from March 6 through 7, 2007, he repaired the roof and received  $700.00 in compensation from the Dennises.

From March 8 through 10, 2007, the outside of the home was sanded.  On March 11, 2007, Hamilton's "crew," consisting of illegal immigrants, used a five gallon can of paint to paint a small portion of the exterior of the home by the attic room.  From March 12 through 13, 2007 Hamilton and his crew performed the subflooring work on the home.  From March 14 through 17, 2007, the air conditioner was installed in the home by an independent contractor.  During this time, Hamilton and his crew installed footing in the floor of the home.

On March 18, 2007, Hamilton poured concrete which was permitted to dry on March 19, 2007.  On March 20, 2007, Hamilton tore out all of the windows in the home.[10]  Hamilton testified that although not all of the windows sustained damage and necessitated repairs, he tore out all of the windows so that a "French window theme" could be placed on the home pursuant to the contract.  On March 22, 2007, he moved a furnace and installed the panel boxes.

On March 21, 2007, Joseph Robinson, an electrician, completed the electrical wiring in the home.  Hamilton contended that Robinson performed a self inspection of the work he performed on the Dennis' home and found the work suitable.

On March 23, 2007, Hamilton requested that the Dennises provide him with the second payment of $13,500.00 pursuant to the contract and it was at this point that, according to Hamilton, "all hell broke loose."  He testified that the Dennises were hostile and refused to provide the second

---

[10]According to Hamilton's testimony, there were approximately 17 windows in the home.

6

draw on the contract.  The Dennises further audited Hamilton three times on the same day concerning his purported expenses.

Notwithstanding the argument with the Dennises regarding Hamilton's purchases, from March 25, 2007 through March 31, 2007, Hamilton began purchasing additional materials for the Dennis' home.  Although Hamilton did not provide the Court with documentation to support his purchases, Hamilton testified that his purchases totaled approximately $3,346.00.[11]  These items were stored at James Singleton's, former Councilman for the City of New Orleans and the Dennis' neighbor, home. Hamilton was living with Singleton at the time.

The relationship between the Dennises and Hamilton quickly deteriorated after Hamilton requested the second payment under the contract.  Hamilton testified that the Dennises were very hostile towards him and his crew and continually demanded that they do additional work for free. Hamilton further testified that the Dennises used racial slurs towards his crew, including telling one crew member, Fai K. Yee, to "go back to China."

The testimony of the parties differs insofar as the Dennises believe that Hamilton walked off the job at some time in March for approximately a week.  The Dennises testified that they were eager to have their home repaired, and therefore let Hamilton return to the home to complete the repairs.  In April, however, he walked off of the job for a second and final time and refused to complete the necessary repairs.

---

[11]Hamilton testified as incurring the following expenses: (1) Wood for $2,200.00; (2) a $400.00 deposit for burglar bars; (3) $160.00 for mud for sheet rock; (4) $45.00 for "45-Minute" Mud; (5) 2 gallons of white interior paint for $160.00; (6) shims to hang the doors for $20.00; (7) lights for $18.00; (8) nails and screws for $32.00; 5 rolls of mesh tape totaling $45.00; (9) 3 rolls of white tape totaling $24.00; (10) 6-8 bags of grout for tiling totaling $32.00; (11) adhesive for grout totaling $40.00; (12) 4 packages of door knob and lock sets for $64.00; and (13) Visqueen, a plastic sheeting material, for $82.00.  The Court notes that in some instances, Hamilton provided a range of possible prices. For example, Hamilton testified that the door knob and lock sets cost between $12.00 and $16.00 a package, thereby costing between a total of $48.00 to $64.00.  For purposes of the total amount of purchases, the Court utilized the highest number for which Hamilton testified.

Hamilton, on the other hand, testified that he only walked off the job once, prior to Easter of 2007.[12]  Hamilton testified that he left the job even though he did not complete the tasks under the contract because the Dennises had a bad attitude and failed to make the second payment under the contract.  The parties agree that, after Hamilton left the job, the Dennises confiscated all of the materials that were stored at Singleton's home that Hamilton had purchased.

After Hamilton left the job, the Dennises had volunteers from the Broadmoor Development Corporation perform work on their home.[13]  Hamilton testified that watching the volunteers work on the home made him sad and caused him to cry.  Hamilton testified that he never sought medical or psychological help for the emotional distress he felt which resulted from the Dennises hostile attitudes and their use of volunteers to perform work on the home.

The volunteers painted the exterior of the home, repaired the framing around the interior windows, and installed insulation and drywall.  The volunteers worked for three weeks.  The total volunteer market value of work done on the Dennises home was $16,596.00.

After the volunteers performed repairs on the home, the Dennises paid Trey Baxter, a plumber, $7,586.00 for plumbing work on their home.  They paid $846.96 to Southeast Flooring for the flooring in their home.  Finally, the Dennises paid Tec21 LLC $1,150.00 for mold remediation.

The Dennises testified that they waited a few months before permitting the volunteers and the various individuals who ultimately restored their home do any work on their home because Hamilton had caused them to distrust contractors.

---

[12]Easter was on April 8, 2007.

[13]The parties testimony differed as to the dates in which the volunteers performed work on the Dennis' home. The evidence deduced at trial, however, reflects that the volunteers from the Broadmoor Development Corporation performed the work in July 2008.  (Def. Exh. 11.)

Hamilton further testified that after he quit working on the Dennis' home, they defamed him throughout the community. This defamation caused him to lose various construction contracts. Hamilton testified only that he lost a contract with the Dennises' daughter Angela for $18,000. He conceded at trial, however, that he did not actually have a contract with Angela and had only submitted a proposal. Although Hamilton testified that he lost "several" contracts as a result of the defamation, he could not identify any individual with whom he lost a contract nor did he call any witnesses to support his claim. Hamilton also was unable to testify as to particular statements allegedly made by the Dennises that constituted defamation.

## III.   Conclusions of Law

### A.   Breach of Contract

The essential elements of a breach of contract claim are: (1) the obligor's undertaking an obligation to perform; (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee. *See 1436 Jackson Joint Venture v. World Constr. Co.*, 499 So.25 426, 427 (La. App. 4th Cir. 1986). *See also Hercules Machinery Corp*., v. *McElwee Bros.*, *Inc.*, 2002 WL 31015598 at * 9 (E.D. La. September 2, 2001)("The central elements of a breach of contract action are the existence of a contract, a party's breach thereof, and damages").

Under Louisiana law, "[d]amages [for breach of contract] are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ.Code Ann. art 1995 (1985). "As a general rule damages for loss of profits may not be based on speculation and conjecture, however, such damages need be proven only within reasonable certainty. Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Cox Communications v. Tommy Bowman Roofing,* LLC, 929 So.2d 161, 166-67 (La.Ct.App.2006); *see also* La. Civ.Code Ann. art 1999 (1985) ("When damages are

9

insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."). "A commonly accepted method of proving lost profits is by calculating profits for similar sales during other periods of time and using such calculations as a basis for estimating lost profits for the period in question." *Lavigne v. J. Hofert Co.,* 431 So.2d 74, 77 (La.App. 1st Cir.1983).

The parties do not seriously dispute that a contract existed. The parties also do not dispute that the terms of the contract were not completed. Instead, the parties dispute who caused the breach of the contract.

The contract, by its express terms, is explicitly between Multi Construction, a fictitious entity, and Walter Dennis. Rosemary Dennis neither signed the contract nor is mentioned in any fashion in the express terms of the contract such that the claim against Rosemary Dennis fails because Hamilton has not stated a claim against her for which any relief may be granted. Therefore, the claim against Rosemary Dennis fails as a matter of law and is dismissed with prejudice.[14]

Turning to the contract between Walter Dennis and Hamilton, d/b/a Multi Construction, the contract clearly expresses that Hamilton was to repair and restore the Dennises' property for a sum of $49,500.00 plus the cost of materials. Such repairs were to include: (a) restored sheet rock which is primed, finished, and painted; (b) replacement of the trim board; (c) restoration of the floor in the living room, bedroom, attic, kitchen and bathroom; (d) new framing of the lower level bathroom[15]; (e) re-framing of the entry garage door with a French window theme; (f) installation of cabinets, bathroom fixtures, lighting, and plumbing for a new water line; (g) upgraded electrical wiring and a panel box

---

[14]P. Exh. 1.

[15]According to the contract, this bathroom would be complete with a custom clear glass shower enclosure, a "marble enclosed sitting shelf,", new tile, and a custom design vanity glass shelve system. (P. Exh. 1, pp. 3-4.)

performed by a licensed electric vendor; (h) exterior of the home stripped, primed, and painted, including new windows with a French theme and the replacement of weather boards; (I) restoration of a spiral stair case; (j) installation of burglar bars; (k) new water and sewer lines; (l) new concrete flooring in the basement; and (m) new window replacements throughout the home.[16]

In return for Hamilton's services, Walter Dennis agreed to pay a total of $49,500.00 plus the cost of materials.  The terms of the contract provided that Walter Dennis would initially provide $24,500.00 as a deposit for the materials and labor.  According to the express terms of the contract, Walter Dennis:

> Agreed for a second deposit in the [a]mount of ($13,500) their after [sic] the electrical wiring & panel boxes has [sic] been installed, their after [sic] passing electrical inspection following up with necessary framing & sheet rock & insulation in the walls & ceiling having been completely installed as required, prime[d] & painted in the interior of the customer['s] home with color scheme, [a]ll necessary plumbing installed as required, 'including' the entire out side [sic] of the home completely prime[d] and painted to the customer['s] color scheme with said windows & doors & burglar bars installed.[17]

Finally, upon completion of the home, Walter Dennis was obligated to furnish a final payment of $11,500.00.

From February 22, 2007, when the contract was signed, to March 23, 2007, when Hamilton made his request for the second payment under the contract, Hamilton had been furnished with $36,602.35 for labor and materials.  Specifically, on February 22, 2007, Hamilton received the initial $24,500.00 payment under the contract[18] for labor and materials and on March 5, 2007, Hamilton

---

[16]Pl. Exh. 1.

[17]P. Exh. 1, pp. 7-8.

[18]D. Exh. 6, *in globo*.  The Court notes that this exhibit includes a check written my Rosemary Dennis made out to herself for $25,000.00 and a money order written to Hamilton for $24,500.00.  The testimony of both parties was that Rosemary Dennis used the $25,000.00 check written to herself to fund the money order ultimately provided to Hamilton.

received $12,102.35 for reimbursement of materials only.[19]  Hamilton concedes that the March 5, 2007, payment for reimbursement of materials exceeded his actual purchases by $5,578.67.[20]  There is no indication that Hamilton ever reimbursed the Dennises for this overpayment.  Instead, he seemingly retained this overpayment as a credit towards future purchases.  Therefore, the Court finds that to the extent that Hamilton claims that Walter Dennis did not reimburse him for the material costs he incurred, the evidence demonstrates that he was overpaid such that Walter Dennis did not breach the contract on this basis.

Under the express terms of the contract, the Dennises were not required to remit their second payment until the electrical wiring and panel boxes were installed; the electrical inspection was passed; framing, sheet rock, and insulation were installed; the ceiling was repaired; the entirety of the home, including the interior and exterior were painted; the plumbing was installed; and the windows and burglar bars were installed.  On March 22, 2007, when Hamilton requested the second payment, the only preconditions which were completed that would trigger the second payment was the installation of the electrical wiring and panel boxes.  No inspection by the City of New Orleans had been conducted on the electrical installation.  According to his own testimony, Hamilton had not installed the insulation, repaired the ceiling,  primed and painted both the interior and full exterior of the home, installed the windows, or the burglar bars nor had the necessary plumbing been installed.

In fact, Hamilton testified that he did not purchase the burglar bars until sometime between March 25, 2007 and March 31, 2007 after he made demand for the second payment.  Further, the evidence shows that a year after Hamilton walked off the job, the Dennises paid a plumber, Trey Baxter, $7,556.00 for plumbing work, a pre-condition for the second payment.  In addition, a letter

---

[19]P. Exh. 10.

[20]*See also* P. Exh. 11.

from the Broadmoor Development Corporation demonstrates that their volunteers, in July of 2008, installed the insulation and drywall, painted the interior and exterior of the home, and repaired some of the windows, all tasks which were to be completed by Hamilton before the second payment under the contract was due.[21]

Because Hamilton had not performed the terms of the contract which required a second payment from the Dennises, the Dennises were justified in not only their refusal to make a second payment, but their inquiry as to Hamilton's work as it related to the payments they had already made to Hamilton. Despite the substantial payments by the Dennises, Hamilton completed only preliminary repairs on the home. The evidence shows that Hamilton, as opposed to the Dennises, breached the contract by failing to perform work in accordance with the express terms of the contract and requesting the second payment prematurely. As such, Hamilton's breach of contract claim fails as a matter of law and is dismissed with prejudice.

## B. Defamation

Hamilton alleges that the Dennises made defamatory statements about his failure to complete the work on their home. He contends that these statements were false because he was not the reason that the repairs were not completed; instead it was the Dennises' alleged breach of contract that caused his failure. Hamilton contends that these false statements caused him to lose various contracts in the community.

The elements of defamation under Louisiana law are: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 674 (La. 2006). "A defamatory communication is one which tends to harm a person's reputation

---

[21]D. Exh. 11.

so as to lower him in the estimation of the community or to deter third persons from association or dealing with him." *Guilbeaux v. Times of Acadiana, Inc.*, 661 So.2d 1027, 1031 (La. App. 3 Cir. Aug. 9, 1995).  To be actionable, the defamatory communication must be "'of and concerning' the plaintiff or directly or indirectly, cast a personal reflection on the plaintiff."  *Guigliuzza v. KCMC, Inc.*, 606 So.2d 790, 791 (La. 1992).  The cause of action fails if any one of the elements in lacking.  *Bell*, 698 So.2d at 753.

"[W]hether a communication is capable of a particular meaning and whether that meaning is defamatory is a question for the court."  *Guilbeaux*, 661 So.2d at 1031 (citing *Sassone v. Elder*, 626 So.2d 345, 352 (La. 1993)).  In answering this question, the court determines, "whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense."  *Id.  See also Sassone*, 626 So.2d at 352.  The court considers "the statement as a whole, the context in which it was made, and the effect it is reasonably intended to produce in the mind of the average listener" to determine whether the communication is "objectively capable of a defamatory meaning."  *Bell*, 698 So.2d at 754.  If the court resolves the inquiry in the plaintiff's favor, then "the recipient's subjective understanding or perception becomes a factual issue for the jury."  *Id. See also Sassone*, 626 So.2d at 352 n.9.  Otherwise, the statement is not defamatory as a matter of law.

Hamilton provided the Court with no evidence that the Dennises made any defamatory statements against him.  Further, he presented the Court with no witnesses who testified that the Dennises made any defamatory statements regarding Hamilton.

Hamilton alleged in his Complaint that he lost a contract with the Dennises' daughter Angela due to the alleged defamatory statements.  He conceded, however, that he did not have a contract with Angela and had merely provided her with a proposal.  Therefore, Hamilton failed to demonstrate that he lost any contracts due to the Defendant's alleged defamatory statements.

Hamilton has failed to prove his defamation allegations and is therefore not entitled to the $49,500.00 he claims for emotional distress.[22]  As a result, this claim is dismissed with prejudice.

**C.**   **Fraud**

Hamilton also alleged in his Complaint that the Dennises committed fraud.  He does not specifically describe the fraud.  Presumably, the fraud consists of the decision to contract with him to rebuild the home and allegedly failing to pay him for the work he performed.

"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss of inconvenience to the other.  Fraud may also result from silence or inaction."  LA. Civ. Code Ann. art. 1953.  There are three elements to an action for fraud against a party to a contract: (1) misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to circumstances substantially influencing the victim's consent to the contract."  *Simmons v. Clark*, 8 So.3d 102, 110 (La. Ct. App. 2009).

The defendant must have induced the plaintiff so that the plaintiff "must at least be able to say that had he known the truth, he would not have acted as he did to his detriment."  *See Sun Drilling Prods. Corp. v. Rayborn*, 798 So.2d 1141, 1153 (La. Ct. App. 2001).  "To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information."  *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La. 1992).

---

[22]The Court notes that the Louisiana law of torts, found principally in the LSA Civil Code, art. 2315 and taken from the civil law, recognizes a right of action for mental suffering or injury to the feelings, unaccompanied by any physical injury, and damages therefor are recoverable in libel and slander cases.  *See also, e.g. Connor v. Scroggs*, 821 So.2d 542 (La. App. 2. Cir. 2002)(general damages for defamation may include injury to reputation, personal humiliation, embarrassment, mental anguish, anxiety, and hurt feelings.)

Rule 9(b) of the Federal Rules of Civil Procedure require the circumstances constituting fraud to be pled with "particularity." Fed.R.Civ.Pro.9(B). Under Rule 9's particularity requirement, the party asserting the fraud claim must allege "the existence of acts and circumstances sufficient to warrant the pleaded conclusion that fraud ha[s] occurred." *In re Haber Oil Co.*, 12 F.3d 426, 439 (5th Cir. 1994)(citing *Askanase v. Fatjo*, 148 F.R.D. 570, 574 (S.D. Tex. 1993); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 ("the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent"). "At a minimum, Rule 9 requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450 453 (5th Cir. 2005). The defendant's state of mind, however, may be generally averred. *See e.g. Collmer v. U.S. Liquids, Inc.*, 268 F.Supp.2d 718, 723 (S.D. Tex. 2003).

Rule 9(b)'s application is flexible and influenced by the circumstances of the case. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993). Pursuant to Rule 8(e), the Court must construe the pleadings "to do justice." *Williams*, 112 F.3d at 178. Though Rule 9(b) requires parties asserting fraud claims to provide more specific allegations than that required of other claims, the Rule does not require plaintiffs to assert every fact they will attempt to prove at trial. Rule 9(b) must be "read in connection with Fed.R.Civ.P. 8 which requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Landry v. Air Line Pilots Ass'n Intern. AFL-CIO*, 901 F.2d 404, 430 (5th Cir. 1990)(citing *Ross v. A.H. Robins Co*, 607 F.2d 545, 557 n. 20 (2d Cir. 1979)); *Williams v. WMX Technologies*, *Inc*., 112 F.3d 175, 178 (5th Cir. 1997).

In his Complaint, Hamilton failed to specifically plead his claim of fraud. He provided the Court with no specific allegations as to what actions by the Dennises constituted fraud. During the trial, Hamilton similarly failed to provide the Court with any specific actions by the Dennises that

16

constituted fraud.  There is simply no evidence, or even specific allegations, which would demonstrate

that the Dennises made any misrepresentation, suppression, or omission of any true information, had

any intent to obtain an unjust advantage over Hamilton, or that any fraudulent act on behalf of the

Dennises substantially influenced Hamilton's consent to the contract.  Therefore, Hamilton's claim for

fraud fails and is dismissed with prejudice.

> **D.     Additional Work Performed**

Finally, Hamilton seeks $2,400.00 for work performed which was allegedly outside of the

terms of the contract.

The only work that Hamilton testified to performing which was purportedly outside of the

scope of the contract was the gutting work, the repairs to the bathroom, the repairs to the leak on the

roof, and the construction of the cement block for the air-conditioning unit.   However, Hamilton's

testimony and the evidence reflect that the Dennises did in fact pay Hamilton for his gutting work and

the leak on the roof.  Specifically, the Dennises paid Hamilton for his gutting work[23] and paid him

$700.00 for the repairs to the leak on the roof.[24]  Further, Hamilton specifically testified that he "ate"

the costs of repairing the bathroom and does not seek to be compensated for this work.  Finally,

although Hamilton contends that he constructed the cement block for the air conditioner outside of the

contract, the contract specifically provides for the "construction of a [c]inder block/concrete base for

[n]ew AC, central [h]eating [u]nit."[25]  Therefore, Hamilton has failed to demonstrate that he performed

any additional work on the Dennises home to which he has not been compensated.

---

[23]The evidence demonstrates that the Dennises paid Hamilton $2,500.00 and not $700.00 as Hamilton testified, for gutting the home except for the walls and the ceiling, removing the debris from under the home, and treating the studs and framing studs for mold.  D. Exh. 1, *in globo*.

[24]D. Exh. 2.

[25]P. Exh. 1, p. 5.

E.      **Request for Public Apology**

Finally, Hamilton requests that the Dennises provide him, and his crewman, Fai K. Yee, a public apology because Rosemary Dennis allegedly told Mr. Yee to return to China.  Hamilton merely alleges that Mrs. Dennis made this statement and provided no evidence to support his claim.  The Court further notes that Hamilton has cited no authority, and the Court finds none, that he is entitled to seek a Court ordered apology on Fai K. Lee's behalf.  As such, the request for a public apology is denied.

IV.     **Conclusion**

Accordingly, for the foregoing reasons, and considering the evidence adduced at trial,

**IT IS ORDERED** that there be judgment in favor of the Defendants, Walter A. Dennis and Rosemary Dennis, and against the Plaintiff, Louis Charles Hamilton, II, **DISMISSING WITH PREJUDICE** all of the Plaintiffs' claims against these Defendants, each party to bear their own costs.

New Orleans, Louisiana, this 14th day of July 2011.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**